5-0-9-0-1-7-6. Counselor, please. May it please the Court, Mr. Besore, my name is Cheryl Henslye. I'm here on behalf of Consolidation Coal Company. This is a case that was filed under the Occupational Disease Act. The case was awarded benefits. The benefits were affirmed by the Christian majority. There was dissent, essentially binding the majority's decision to be against the manifest way of the evidence and contrary to law. We have appealed this decision on the basis of the statutory language of the Occupational Disease Act, specifically Section 1F of the Act as it relates to the Act which requires that a claim be filed within three years to obtain any benefits other than coal workers' pneumoconiosis and further extends the statute of limitations to five years if there is pneumoconiosis as well as Section 19D of the Act which addresses various practices of the employee. To save a little time, because the facts of the briefs are well put in both by Petitioner's Counsel as well as our brief, the issue with regard to Section 1F, if you look at the Commission's finding, basically the Commission majority adopted the arbitrator's decision. And the arbitrator's decision basically concluded that they found the testimony of Dr. Ewell to be the most persuasive. So, knowing that basically that is their realm for them to decide, that's going to be the basis from where we start with, okay? Assuming that Dr. Ewell's opinion was correctly determined to be the one to rely on, which at this point we really can't argue otherwise. You can, but it may not cure today. Yeah, it's not going to get me very far. Let's just leave it at that. You need to look at the entire testimony of Dr. Ewell with regard to his opinion. We are specifically trying to determine when somebody was disabled and if they were disabled. In this case, Dr. Ewell's examination was on April 2, 2003. Mr. Hewlett's last date of exposure was September 3, 1999. So, we are almost four years, three and a half years after he left the mine, okay? Dr. Ewell is the only physician in this record to provide an opinion that was apparent in that two-year time period discussed by Section 1F. What the commission decision, the majority, and the arbitrator's decision do not address is the fact that Dr. Ewell specifically stated that the only way to diagnose full-reference pneumoconiosis was by chest x-ray. He did not review any of the employee's medical records and he did not examine Mr. Hewlett until April 2, 2000. So, Debra, let me ask you, you made the argument, Dr. Ewell, was his opinion, medical opinion supported by Alexander's interpretation? No, not with regard to 1F because Dr. Alexander did not proffer any opinion with regard to when disablement occurred. The tiny, we're limiting it solely to this disablement within two years and Dr. Ewell is the only one who provides any opinion. He goes on to say he prior to that date. He agreed there was nothing in his records that indicated Mr. Hewlett had full-reference pneumoconiosis on the date he was last exposed to coal dust. He further agreed that he couldn't state to a medical degree of certainty that the opacities were present when Mr. Hewlett left the mine. It was his opinion that there was coal dust in his lungs, the process was ongoing, it just wasn't evident. He then went on to state it the number of opacities, if any, that would have been on the film at the time Mr. Hewlett left the mine. Now, since we're going to go with Dr. Ewell because that's what the commission and the arbitrator have pretty much left us with, it is the position of Consolidation Coal Company that those words make any finding of disablement within two years after Mr. Hewlett left the mine virtually impossible. It is purely speculative. There is no film. He doesn't say they definitely have it. It wasn't even he may have had it. It was within a reasonable degree of medical certainty. I can't tell you it was there. So, first and foremost, we think that the finding that Section 1F was met is against the manifest way of the evidence because that is the only opinion in the record discussing that he would have had it when he left the mine. Certainly he was the only physician other than Dr. Alexander to even diagnose the condition. The second issue has to do with Section 6C, which is the statute of limitations. The commission decision is making a finding of disablement based on conditions other than coal worker's pneumoconiosis, which if 6C has any merit whatsoever, any claim for any condition other than coal worker's pneumoconiosis is gone if the claim is not filed within three years. In this case, the date of filing was December 3, 2002, which was three years and three months after Mr. Hewlett left the mine. We think that the only basis to determine disablement should be a finding of coal worker's pneumoconiosis because that is the only claim he can get benefits for based on the statute. The third issue that we had on appeal was notice. They basically said notice was sufficient. This is another one where if he had it when he left the mine, which is what they are saying, based on the date of filing were three years and three months after, which would be the first notice, which certainly is an issue with as soon as practicable, which is the statutory language. Then you have 19D. 19D basically says if an employee shall persist in an insanitary or injurious practice which tends to either imperil or retard his recovery or refuse to submit to medical or surgical hospital treatment, blah, blah, blah. The commission may in its discretion reduce or suspend the compensation of any such employee. We made the issue of 19D in this case because Mr. Hewlett had a smoking history of a pack and a half a day for 50 years. This man has filed an application for benefits for a pulmonary condition. Both Dr. Ewell and our expert, who I am going to give credence to because he wasn't the one that they chose, agreed that the smoking history of Mr. Hewlett was substantial and it would have caused damage to his lungs. And the commission majority affirmed the arbitrator's finding that section 19D is inapplicable. Now how you can find it to be inapplicable when you have a pulmonary condition that's caused by two different sources, one of which is clearly an injurious practice that is the petitioner's own will. We'll give you that the coal mine might be doing the other part, but the coal mine's not making him smoke. So with that said, we think that the finding that 19D is inapplicable is erroneous as a matter of law. Are you arguing that smoking is a matter of law and injurious practice? As a smoker, I would say it is. But with that said, the evidence in this record specifically states that it is. So we'll go with the evidence that's in the record that it is. How do you reconcile that position with this court's recent decision in global products? Are you familiar with global products? I am, and I was hoping you would ask me about it. Because global products is a guy who injured his back at work, he went under surgery, the fusion failed, he was a smoker, they said we're not going to get another surgery because you're a smoker so it's just going to fail again. His claim was for a back injury. He had this other condition that he smoked and it might have affected the fusion. I don't know that the evidence in that case specifically said that if he was not a smoker it would have absolutely fused. He was filing for a traumatic injury that in all honesty was not harmed. There was no evidence to show that his back was worse from his smoking. In the case at Barr, we are talking about a claim for benefits for a pulmonary condition. They specifically are saying he's got COPD, that's a smoking condition. You've got the coal dust thing too, I'm not trying to belittle that. But if you file a claim and you say I have injured my lungs because I worked in this coal mine and I have this disease, then section 19D which addresses an injurious practice, which smoking under the evidence in this case clearly is. All right, so you're saying under facts global products can be distinguished. Absolutely, because there was no evidence that the smoking was the cause that it didn't fuse, just for starters. In this case their own expert agreed that the smoking was certainly a factor with regard to the gentleman's COPD that was developed over time. Getting back to your earlier point, was your position that Dr. Ewell's testimony did not causally connect the claimant's condition to his employment? I think that is the position that we believe is correct, because if you're going to testify under oath that within a reasonable degree of medical certainty you can't state that he had the condition when he left the mine, how do you get section 1F met? If that is the only opinion in the record saying that he was disabled in that time period. Do you have the record site for that quote from Ewell? Yes, Your Honor, I do. Yes, it is C100 and 101, Your Honor. Basically all that testimony runs from 97 to 102. What he didn't see, and then when he says it would be pure speculation as to the number of opacities, if any were on the film, that's 101 to 102. But basically that whole 97 to 102 was where that testimony with Dr. Ewell was. Basically, Your Honor, we think that the dissent that was filed by Commissioner Bracerto is directly on point. He did not address 19D, but with regard to disablement, if that's the only guy that's providing the testimony, and that's his testimony, that's not substantial support. That's incredibly weak support, especially when the entire record says otherwise. Our issues are statutory. I think all of these statutes need to be read together. I think if you file a claim for a pulmonary condition and you smoke a pack and a half a day for 50 years, that it is something that is applicable. Whether the Commission's findings in themselves may have been correct, I think their interpretation of these statutes is absolutely erroneous. And to say that something is inapplicable for a pulmonary condition because they just say it's inapplicable, it makes no sense. I mean, if you want to take FITS, because FITS is what, if I had to hazard a guess, FITS is what Mr. Resor is going to come up and argue, which is a Supreme Court case. Is there speculation on your part that Mr. Resor is going to argue that? That is absolute speculation, and under CISPRO I'll just qualify that right now. But FITS is a Supreme Court case that basically said we're not going to take out the pieces. If someone's disabled, we're going to pay them for their total disablement. Okay? And I think, you know, it is certainly a decision that is absolutely contrary to 19D. And if you actually read the FITS decision, 19D is not addressed. I mean, it's a great sentence in FITS for every employee. We're not going to part and parcel out your disability. If it's part preexisting and it's part your job, it all gets sucked up together and we're going to award you benefits for it. That's great. But they did not address the statutory language of 19D. And I think that might have been a big problem with the Supreme Court because I don't think you can come to the conclusion that the Supreme Court came to if you incorporate 19D because they're completely obvious. You argued at the commission that we should reduce the amount of the PPD award. I'm arguing that that's something that should have been considered. The problem we get into here is that they didn't. Do you think that a setting of 7.5% might have considered that exact thing? Well, if they had not put the words in their decision that said Section 19D is not applicable. So it is impossible for us to assume that they considered it and they gave them a lower rate because their own language pretty much took care of that. Had they just said, we think it's all, it only needs to be a positive factor. If they didn't have that one little sentence on the fourth finding, then yeah, I think we could all probably stand here and say, yeah, they might have done it because this is a little bit lower than what these guys usually get. I think that would be a fair assessment. But they didn't. They have a statement that flat out says Section 19D is not applicable for a pulmonary case where a guy smokes a pack and a half a day for 50 years. That's, as far as I'm concerned, that's erroneous as a matter of law. Are there any further questions, your honors? Thank you, counsel. Thank you. Counsel, please. May it please the court. My name is Bruce LaSore and I represent Harry Hewitt. I'm going to start out with Consol's 19D argument. The act states that if the minor persists in practices that imperil or retard his recovery, or if he refuses medical, surgical, or hospital treatment that's reasonably essential for his recovery, then the commission may, in its discretion, reduce or suspend the compensation. In this case, the commission did exercise its discretion. It didn't reduce or suspend the compensation, and it said why. It's just that Consol doesn't like the commission's decision. Consol specifically argued in his brief that the only finding the commission made with regard to 19D was that it was inapplicable. It's not true. The commission also said the occupational disease only needs to be a causative factor in a disabled case, and that testing won't tell you the cause of the defect. The commission knew that no matter what happened with any continued smoking, there would always be a part of the obstruction caused by mining. So the mining would always be a causative factor in the disabled. The commission also knew that any attempt to apportion the smoking part of the obstruction from the mining part would just be speculation, because there's no objective way to do it. In fact, there isn't even any subjective evidence in this case to base an apportionment on. No expert even tried. Mr. Hewlett started smoking at the age of 16 or 17. Here's where we get to global. He was smoking before he started mining, before he got his pneumoconiosis, and obviously before he got his obstructive lung disease. The coal mine takes the employee as it finds him. There's no evidence that Mr. Hewlett started smoking in order to imperil or retard his recovery from pneumoconiosis or obstructive lung disease. When you're talking about the disease of pneumoconiosis and smoking, there's no way for 19D to apply. You can't recover from pneumoconiosis. It's permanent. It can stay the same or it can get worse. It can even get worse after you leave the mine. Quitting smoking won't cure or improve the part of the obstruction that was caused by mining, and quitting mining won't cure or improve the part of the obstruction that was caused by smoking. Mr. Wessor, you're a doctor opined that this man had CWP on the day he was last exposed to coal dust. Did he state or didn't he state that he couldn't state as a matter of medical certainty that the opacities were present when he left the mine? I think that... Did he say that? I think, well, he said a number of things because the testimony went over a number of pages. Now, I can't cite the... I can tell you that the page in the deposition, page 28, where he said, if he's got it now, he had it then because it's the only place he could come from. That's what he was saying. And I think one of the reasons that the commission likes Dr. Ewell and chooses him over doctors with higher qualifications is they find him very honest. He's not a professional witness. On the other hand, as such, it's like eating worms to take his deposition when good counsel for the other side, which is, you know, this other firm's good, they ask him questions, he stumbles around, but eventually he comes to the truth. And he did here, and it's at page 28 of his deposition, where he said, I don't think you can develop it later. That was the conclusion of those few pages. I don't think you can develop it later. And the whole tenor of those couple pages was, hey, if you've got it now, it had to come from there. Nothing else caused it but that. After this, therefore, because of this. Pardon? After this, therefore, because of this. I suppose so. But that's, you know, that's bad logic. My hearing's not very good. It's bad logic. Just because a thing exists after another event doesn't mean it was caused by the other event. There is, that's not a train of logic. It's bad logic. Of course, black lung defies logic in as much as co-workers' pneumoconiosis, and this is what Dr. Ewell said, co-workers' pneumoconiosis is only caused by one thing, exposure in a coal mine. If he's got it now, he had to have it then, how ridiculous would it be to say the contrary? He worked 32 years, he didn't have it, he didn't have it for two years later, he's had no exposure, and now he's got it. Where did he get it? So Dr. Ewell said, yes, he had to have it then. He couldn't tell you exactly how much. He couldn't tell you how many capacities there were. But the commission decided that that's what he said. I think that's what he said. They decided that's what he said. Now, and we're getting back to 19-D, and that it doesn't apply to pneumoconiosis or obstructive disease in a miner who continues to smoke after he leaves the mine. For some reason, Consall looks at these words and comes up with different conclusions than I do. And I'm not sure why Consall did it, but at page 13 of his reply brief, one example is, they got tangled up in the facts, beginning to testify as to a worsening in pulmonary function between Dr. Ewell's testing in 2003 and Tudor's testing in 2005. Now, they correctly said that the FVC went down from 4.21 liters to 3.86 liters, but they forgot to include the fact that Mr. Tudor also got two years older and that the table for predictive normals are tied to your age. So in 2003, his FVC was 90% of predictive. But by 2005, it had gone up to 103% of predictive. It actually went up 13%. His FVC, the same way. By 2005, it actually went up 8%. It had gone down in real numbers. But he'd gotten two years older. The tables changed. Consall ignored that. Consall didn't tell you that in the brief. Now, regardless of what the numbers of testing were, Dr. Ewell said, there was a mild obstruction. Two years later, Dr. Tudor says the same thing. There was a mild obstruction. Now, I'm going to get to the other issues of this case. Is it Dr. Alexander's interpretation that says that he found irregular opacities consistent with the commission to accept Dr. Ewell's opinion? I think that the commission could accept Dr. Ewell if it had no one else. However, I think that they've become stronger. Can the commission take Dr. Ewell, a general practitioner, not a pulmonologist, not a bee reader, and totally ignore Tudor and a bee reader? You think they can do that? I think they can. And not get reversed? I don't want to get annoyed about something that didn't happen. It hurts my feelings. My understanding. Okay. And not get reversed? I mean, isn't it Alexander that allows the commission to accept Ewell's opinion? Because Alexander finds pneumocomials. As you state that question, I think that's exactly right. I think that the totality of the evidence is you've got Dr. Ewell who sees all these guys. He's a plain family doctor down there. He treats these guys, lots of coal miners, but he doesn't have the credentials. But Dr. Alexander does. That's what backs him up. And that's what makes it solid. But you ask my personal opinion, my professional opinion is I've been up here enough where I thought I had strong evidence and the commission wins when it decides something. I think the commission could, if it wanted to, decide Dr. Ewell. It didn't here. So I don't want to hurt myself by arguing something that didn't happen. But I have to be honest with in answering your question. I think they have great, great latitude in who they pick and why. And we don't get to hear why. They might have gone back there and talked about it and said, you know, this tutor is highly qualified, but the liar, he always finds a negative. I just don't believe it. And I kind of like the way Ewell's done it. We're not party to that. But if that's what they did, it would have been reasoned. And I think the law gives them that power. Thank you for letting me go on about that. There is something in the way Consalgo is about reading this case that I disagree with. And let's talk about Dr. Ewell's credibility. I think they went a step too far in their brief. At Dr. Ewell's deposition, page 9 and 10 of that deposition, counsel for Consalgo determined that Dr. Ewell has 5,000 to 6,000 patients, 500 of which are minors. And he's actively treating 200 minors for lung diseases. Now, he didn't know how many were just for the black lung, but 200 for lung diseases. Obviously, he doesn't refer out all of his patients with pulmonary disease to pulmonologists. And counsel asked a specific question. Have you referred some of your patients over the years to pulmonologists to take care of some of your patients who may have pulmonary diseases? To which Dr. Ewell said yes. He said some of his patients over the years. But by the time this exchange got into Consalgo's brief, it had been enhanced to look like he referred all of his lung disease patients to pulmonologists. Quote, Dr. Ewell stated that he actually refers out his patients with pulmonary disease to pulmonologists. He does not. He treats them. Dr. Ewell never said he refers all his patients with pulmonary disease to pulmonologists. And Consalgo repeated that error three times in its brief and in its reply brief. If there was any question that Consalgo was enriching the facts, it took it to another level. At page 8 of its reply brief, Consalgo says that by Dr. Ewell's quote, own admission, he refers his own patients with co-workers pneumoconiosis for treatment to actual pulmonologists, which belies the pronouncement that Dr. Ewell was an expert based on experience, close quote. He never got anywhere near that. I don't think that was with evil intent. I think it was the zeal of the argument. Nonetheless, it's not true, and I have to protect my client. Now, Consalgo may get up there and say, I should have cleared that up at the deposition. But there wasn't anything to clear up at the deposition. I couldn't know that some patients with pulmonary disease over the years was going to be made to look like all patients, or that it would eventually morph into referring his patients with pneumoconiosis to actual pulmonologists. And in that three-paragraph dissent with Commissioner Barsuto that was copied into the brief here, I think it's important to note that he repeated Consalgo's stretch three times, word for word. Did that come from Consalgo's brief? I don't know. It wasn't in the deposition. He said it each time. He said, Dr. Ewell, quote, refers his patients with pulmonary disease to pulmonologists. Significantly, he made no such referral with respect to petitioner, close quote. That testimony never existed, but it was important to Commissioner Barsuto. And one thing we're talking about, these guys, is important. When that is in the dissent, clearly these guys thought about it, okay? Barsuto said these things. Now, I'd argue that Barsuto was wrong. That's not in the deposition. I'd argue Consalgo's brief was wrong. It's not in the deposition. But the important thing is Barsuto did not convince the majority. The majority stayed with the practitioner who treats a lot of coal miners and has that common sense knowledge. Another thing that's wrong with Consalgo's characterization of Dr. Ewell, and it happened at page 9 of his reply brief, in a paragraph on 1F, and it said, quote, the only physician to opine that the employee had pneumoconiosis when he left the mine was a physician who testified that his opinion was purely speculative, close quote. And I ask the court to note that the only time the words purely speculative show up in the deposition is at page 25, lines 24 and 25, in regards to how many opacities are required for a positive x-ray for pneumoconiosis. Dr. Ewell never testified his opinion on whether Mr. Ewell had pneumoconiosis when he left the mine was speculative. And I ask you to also note that under the rules of the ILO, it would be speculation for somebody to say how many opacities there were. That's not the way they do it. They say here's a 1 over 1, here's a 0 over 0. Which one does your x-ray look more like? There's too many. They're too small. There's no such thing as 5,300 dots on the x-ray makes it 1 over 1. 5,700 makes it. That's just not the way it's done. So when he says it would be pure speculation for me to say how many opacities were there, he is correct at any time you look at the x-ray. He was right. It does not hurt his credibility. Now, going back to the other issues of the case, the commission decided that Mr. Ewell has pneumoconiosis. That was based on the opinions of Ewell and Alexander. It's proper for them to make that decision. Ewell and Alexander should win the day. Alexander, board certified in radiology, and Westerfield isn't. He's the backup. Now, the dominoes fall in this case the same way they do in all pneumoconiosis cases, and the testimony backs it up. Once they decided you have pneumoconiosis, they pretty much decided on that. They decided disablement because the testimony shows if you have pneumoconiosis, it is disabled by definition. There's functional impairment, and you can't go back. They also, even Dr. Westerfield's testimony says, or even their expert's testimony says if he had it, Dr. Tudor, if he had it, he certainly had it within two years of when he left the mine, and we can't leave that up. So that once you have co-workers' pneumoconiosis, these other questions are answered as the dominoes fall. In terms of the extent of the award, this is one of the smaller black lung awards that you're going to see. Is that because they took 19-D into account? I hope not. I hope this guy was just unlucky and he got one of the lower awards because I don't think 19-D has anything to do with it. I think the coal mine has to take the employees to find them. Nothing says this guy quit mining and started smoking. You're retarded. He's recovered. And that's what you have to show for 19-D to apply. Although in the end, sometimes I like it and sometimes I don't. The commission made in its discretion, and they did not in their discretion decide to apply 19-D. One other thing about the treatment records, Consol wants you to rely on treatment record entries, but if it does that, it should give them a fair reading. At page 24 in his brief, Consol wrote, quote, the arbitrator failed to address the later entry from March 23, 2005 that indicated the employee did not have black lung but had lung cancer. Well, the entry from that day actually reads that Mr. Hewlett was told he had lung cancer and he was told he did not have black lung, which makes sense. It's about 30 days after Dr. Tudor's exam. But the treater didn't buy it. Because under the assessment plan part of that note, he wrote, co-worker's pneumoconiosis will have him examined by Dr. Hauser. Also, he went on and said, I find nothing to suggest he had cancer, even though he had prostate cancer in the past. And he looked at his labs for that. I ask the court to affirm the decision of the commission. Thank you. The federal, please. Your Honor, with regard to the last statements that were made by Petitioner's Counsel, I do not know that there is anything in the record that states that. It says there's a referral to Dr. Hauser. There's nothing about cancer thereafter. So I don't know what records he's talking about, but I have not seen it in there. Specifically, with regard to the domino theory, if the domino theory is what we are going with, then somebody needs to explain why we have statutes. Because our statutes require certain elements be met before a claim is deemed compendial. First and foremost, Section 1F is a condition pressing to recovery. The only physician that opined that Mr. Hewlett had full workers' pneumoconiosis and that he had that condition when he left the mine can only come from Dr. Ewell. Dr. Ewell's testimony is not confusing. He does say he's not a pulmonologist. He refers some of his patients out. Can you get CWP any place other than in a mine? No. Okay, now let's slow down. Ewell says he's got CWP, and in his opinion he had it when he left the mine. Alexander reads the x-rays and says pneumoconiosis. Why isn't that enough? Put them together. If you believe Alexander's reading of the x-rays. Because this is a slowly progressive disease. But wait a minute. If he didn't go to any coal mine after he left your coal mine, and the only way you get CWP is from a coal mine, and Alexander reads an x-ray that in his opinion says he's got pneumoconiosis, why then doesn't it logically follow he got it in a coal mine? If it's the only coal mine he's been in. Okay, now I'm not trying to not answer your question. I'm actually going to answer it. Well, the last guy got in trouble for not answering my question. I know, so that's why I qualified it first. Let the guy give you the answer, huh? What I was saying before is trying to address the question that you have. It's not a question as to whether it's caused by the coal mine. The question is whether someone was disabled, okay? And if you are disabled by co-workers' pneumoconiosis, you have to have a positive interpretation of the film. Agreed? We would agree with that, okay? Someone doesn't suddenly go from a 0-0 to a 1-0, 1-1, 1-2, okay? What Dr. Ewell is talking about when we're talking about the opacities that are seen on the film, those are the NIOSH chest films. And basically you have your NIOSH film and you have the coal miner's film. And you look at them and you compare how many opacities are on one film compared to another. And if the number of opacities that are seen on a chest film do not equate to what would be a 1-0, it's not a positive chest film and someone is determined not to have co-workers' pneumoconiosis. Specifically, if you look, I mean, and it goes back, because the B Reader system goes back to the federal system, but if you look at the federal regulations, they specifically state that a 0-1, meaning they looked at it, there were some opacities there, but we really don't think it met the 1-0 NIOSH film. That means it's an automatic negative film. There is no positive interpretation of that film. So when Dr. Ewell is talking about the only way to diagnose pneumoconiosis is by opacities, and he's sitting here saying, I have no idea how many opacities were on that chest film. This is the only chest film I have, and I don't know what was on there two years ago or three years ago. I don't know. And I can't tell you within a reasonable degree of medical certainty that he had the condition. Not everybody progresses. So, I mean, you can't just pick and choose pieces out of these experts' opinions, and that is what the employee is basically trying to do here and what the commission has done. You have an expert who has specifically testified within a reasonable degree of medical certainty. I can't tell you that those opacities were there, and that's the whole point. He can't tell you that he had pneumoconiosis. The only claim he can get benefits for is pneumoconiosis. So as a matter of law, based on that testimony, saying it's speculative and I can't do it within a reasonable degree of medical certainty, he should not have been found to be entitled to benefits pursuant to Section 1F. You know, if he had said anything other, if he said, I think it might have been there, he says it at the beginning, but when he's cross-examined about it, he then is like, I can't tell you it was there. I can't do it. And that is what dooms the case for Mr. Hewlett. His guy was not sufficiently qualified to be able to address the issues that needed to be addressed. And for that reason, you know, if 1F doesn't hold, the rest of the dominoes fall. But I don't think you can say, oh, he's got pneumoconiosis. They've already met Section 1F, which is exactly what Petitioner's Counsel told you, because if that were the case, there would be an exception under the Occupational Disease Act that says, hey, if you've got pneumoconiosis, you automatically made 1F. Don't worry about it. You don't have to have that. Thank you, Counsel. Thank you, Your Honors.